(C. D. 1279)

LEONARD ZWYNS *v.* UNITED STATES

## United States Customs Court, First Division

(Decided October 10, 1950)

*Pemberton & Orloff* (*Monford A. Orloff* and *Joseph T. Pemberton* of counsel) for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*Arthur R. Martoccia*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Merchandise, invoiced as "fresh salmon eggs," imported at the port of Blaine, Wash., and covered by 15 informal entries, was entered free of duty as fish roe not fit for food purposes under paragraph 1671 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1671),[1] and the collector of customs, in his original liquidation, adopted the importer's entered classification.

Later, and within 2 years after the date of liquidation, the collector, acting pursuant to the provisions of section 521 of the Tariff Act of 1930 (19 U. S. C. § 1521),[2] with "probable cause to believe there is fraud in the case," reliquidated the entries, classifying the merchandise as fish roe fit for food purposes under paragraph 721 (d) of the Tariff Act of 1930, as amended by the trade agreement with Iceland, 79 Treas. Dec. 79, T. D. 50956, and assessing duty at 10 cents per pound on an aggregate weight of 72,625 pounds.

The classification on reliquidation was based on the premise that the importations consisted of commingled merchandise, i. e., some of the salmon eggs being fit for food purposes and others not. Hence, the provisions of section 508 of the Tariff Act of 1930 (19 U. S. C. § 1508),[3] were invoked, and all of the imported merchandise became "subject to the highest rate applicable to any part thereof."

Plaintiff's principal claim is that all the merchandise is free of duty under paragraph 1671, *supra*. In an alternative claim, relating to weight, plaintiff contends that the actual weight of the imported eggs was 32,300 pounds, and not the amount assessed by the collector.

The record is not as clear as it might be. All of the proof was

---

[1] PAR. 1671. Eggs of birds, fish, and insects (except fish roe for food purposes): *Provided*, That the importation of eggs of wild birds is prohibited, except eggs of game birds imported for propagating purposes under regulations prescribed by the Secretary of Agriculture, and specimens imported for scientific collections.

[2] SEC. 521. RELIQUIDATION ON ACCOUNT OF FRAUD.

If the collector finds probable cause to believe there is fraud in the case, he may reliquidate an entry within two years (exclusive of the time during which a protest is pending) after the date of liquidation or last reliquidation.

[3] SEC. 508. COMMINGLING OF GOODS.

Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

heard and submitted before the chief judge at Seattle, Wash., sitting as a single judge on circuit, who had assigned himself to hear or to hear and determine said litigation, pursuant to authority existing in the statute governing this court, 28 U. S. C. (1946 ed. Supp. III) § 254. Evasive answers and indefinite statements, abundant throughout the testimony, will justify some comment by the trial judge concerning the demeanor of the witnesses in assessing the weight of the evidence. It is not within my province to attempt to do this.

The views of the writer of this opinion, set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of the division to decide a case somewhat similar to these proceedings, continue as the minority expression of the division. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent on the writer's participation in a decision of the same. Adhering to views expressed in the *Bush* case, *supra*, but for the purpose of expediting the work of the court, the writer has prepared this opinion and is participating in the decision and judgment accompanying the same.

Stripping the record of nonessentials, the proof justifies this summation. Plaintiff had two plants used for processing salmon eggs. One was located at Steveston, British Columbia, and was operated as the West Coast Fish & Fish Products Co., engaged exclusively in handling salmon eggs for bait purposes. The plant in this country was at Lynden, Wash., where the present merchandise was delivered after importation. To distinguish between amounts delivered to plaintiff's Canadian plant and quantities exported, separate invoices, covering the respective categories, were issued by British Columbia Packers, the foreign shippers. Illustrative of the procedure is a set of invoices, plaintiff's collective exhibit 1, relating to transactions with the plant at Steveston, British Columbia. The papers were issued by shipping clerks at the cannery of the British Columbia Packers, and show plaintiff as the seller, with his Canadian plant as the purchaser. None of the enumerated items was exported. The shipments in question are covered by invoices attached to the entries. All of these invoices, as well as the entries, bear the notation, "Unfit For Human Consumption." The invoices were prepared by employees at the cannery of the Canadian shipper, and the entries were prepared by customs inspectors, following their official examination of the merchandise.

Plaintiff, personally, explained the procedure followed in acquiring and ultimately disposing of the merchandise in question. In the process of dressing salmon, the eggs are obtained as part of the offal carried on a transmission belt for disposal. As this conveyor or transmission belt is running its course, about 50 feet, the eggs are removed and placed in 5-gallon, second-hand, tin cans that are "used over

and over again from one year into another." The containers are not sterilized and no attempt is made to maintain an antiseptic condition. They are merely washed or rinsed with cold water. Emphasizing the lack of sanitary conditions in the plant, the witness testified that "We are not allowed to spit on the floor and they are allowed to spit on the reduction belts." No preservative of any kind is used, either when the eggs are put into the metal containers, or during their transportation in trucks to plaintiff's plant in Lynden, Wash. These salmon eggs were imported "for bait purposes and feed only." They were unfit for human consumption because deterioration had set in to such extent as to create an acid, poisonous to the human system, and changing the color of the eggs from normal white and yellow, to a decaying black and dark red.

There is no contradiction whatsoever to that part of plaintiff's testimony, describing the extremely careless and somewhat disgusting way in which the salmon eggs in question were handled prior to shipment by the Canadian exporter. In the light of such testimony, it is difficult, if not impossible, to visualize even the slightest chance of the resultant product becoming available for eating purposes.

After arrival at plaintiff's plant, the eggs were washed in a solution of formaldehyde and brine, to prevent further deterioration. The effect of the treatment is to open the cells, causing the eggs to swell and increase in weight. All of the imported quantities were taken to Seattle where they were sold to three companies, i. e., "Siberian Fish Products and Peter Sellen and to the Main Fish Company."

The record contains no mention of transactions with the Siberian Fish Products Co., but plaintiff called Peter Sellen who testified that all salmon eggs purchased by him were processed for use as bait and none was fit for food purposes. There is no dispute over this testimony. In fact, Government counsel, in their brief, concede the correctness thereof.

Another witness, A. Balashoff, appearing under subpoena issued by plaintiff, also testified that the salmon eggs purchased from plaintiff were processed for bait purposes, but later, and on cross-examination, he expressed doubt concerning the accuracy of his previous statement, admitting it was made solely from memory and without the benefit of any records. The only evidence of the witness receiving any salmon eggs from plaintiff is a statement to the effect that 10 cans of such eggs were taken for the purpose of testing them to ascertain whether they would be suitable for bait purposes.

Defendant subpoenaed Ray Kihara, president of the Main Fish Co., to support the collector's action, and attempt to show that the shipments under consideration consisted of commingled merchandise. After stating that he made purchases from plaintiff during the period in question, the witness identified several invoices relating to salmon

eggs, defendant's collective exhibits 2, 3, 4, and 5, which, he testified, went into the manufacture of caviar, sold "mostly to the Japanese trade," although some was exported to Hawaii. An examination of the said invoices discloses that the merchandise was purchased from the West Coast Fish & Fish Products Co. of Steveston, British Columbia, which is plaintiff's Canadian plant, so the items covered thereby were not plaintiff's importations but rather those made by the Main Fish Co. Support for this conclusion is found in testimony on cross-examination, to the effect that the witness' company had previously imported salmon eggs and paid approximately $1,500 for the duty thereon. This proof falls far short of establishing, as defendant intended, that the purchases referred to in the said invoices were part of the present merchandise.

The accountant for the Canadian shipper, appearing on behalf of defendant, testified that plaintiff's invoices, collective exhibit 1, *supra*, were not valid records of the shipper, although the witness identified signatures thereon as those of his employees and admitted that the papers were prepared by them, but stated that they had exceeded their proper duties in so doing. Several of the Canadian shipper's official invoices, defendant's collective exhibit 6, showed deliveries of salmon eggs to plaintiff and for which payment was made. Each bears a date the same as an entry in question, and the quantity stated on the official record exceeds the amount set forth on the entry for the corresponding date. The inference that defendant seeks to have drawn is that plaintiff's actual importations were in greater quantities than those stated on entry.

The deficiency in the proof is the witness' complete unfamiliarity with the procedure followed at the cannery where deliveries of the merchandise were made and original records prepared. All of the accountant's testimony was based on a mere reading from such records, and without any personal knowledge either of the method pursued in preparing them or in correlated work, which included making deliveries and the differentiation recognized when sales were made for export and when the salmon eggs were sent to plaintiff's Canadian plant. The evidence cannot be accepted as contradictory of plaintiff's contention.

The deputy collector of customs at the port of entry substantiated plaintiff's testimony to the effect that the informal entries in question were prepared by customs inspectors who noted thereon that the merchandise was unfit for human consumption. The procedure followed the usual practice for such merchandise, consisting of a casual or quick inspection of the merchandise as loaded on the trucks.

The most important phase of the record is plaintiff's uncontradicted testimony outlining the unsanitary conditions prevailing in the plant where the salmon eggs in question were acquired. It is inconceivable

that merchandise handled and shipped under such conditions could be accepted and regarded, not to say actually used, "for food purposes." We are unwilling to embrace even remotely any suggestion that the authorities to which the public has a right to look for protection, would permit such a mess to reach a consumer's food market. We cannot countenance the attitude of defendant in this case to bring such a condition about.

The record, in its entirety, is sufficient to support plaintiff's claim. Accordingly, we hold the merchandise to be entitled to free entry under paragraph 1671, *supra*. Judgment will be rendered accordingly.